UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                      :

THE NEW YORK TIMES COMPANY and    :
CHARLIE SAVAGE,                           :
                                Plaintiffs,   :           14-CV-3777 (JPO)
                                      :

                       -v-                 :          OPINION AND ORDER
                                      :

THE UNITED STATES DEPARTMENT OF   :
JUSTICE,                               :
                            Defendant.  :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

       Plaintiffs Charlie Savage and the New York Times Company (collectively "the Times")

bring this action against Defendant the United States Department of Justice ("DOJ") under the

Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  The Times seeks information related to

DOJ's investigation into the destruction of videotapes of CIA interrogations and into the deaths

of detainees in CIA custody.  The parties have cross-moved for summary judgment on the

question of whether the requested documents are exempt from disclosure under FOIA Exemption

Five, 5 U.S.C. § 552(b)(5) ("Exemption Five").  For the reasons that follow, DOJ's motion is

granted in part and the Times's motion is granted in part.

## I.  Introduction

       In January 2008, then-Attorney General Michael Mukasey opened a criminal

investigation into the destruction by CIA personnel of videotapes of detainee interrogations.  He

appointed John Durham, then an Assistant United States Attorney ("AUSA") in Connecticut, to

lead the investigation.  Durham promptly assembled a team of AUSAs and FBI agents to help

him interview potential witnesses, gather evidence, and determine whether criminal charges were

warranted.

After two years of investigating, Durham produced a 1,037-page report describing his results (the "Tape Destruction Report").  He recommended that criminal charges not be brought in connection with the destroyed interrogation tapes.  DOJ announced Durham's recommendation in a brief press release in November 2010.  (Declaration of Douglas Hibbard, Ex. E-1.)  Durham then continued to investigate whether any potential witnesses had lied to him, to his team, or to a grand jury during the course of his investigation into the tapes.  In 2012, Durham sent a memo to the Deputy Attorney General with his recommendations (the "Obstruction Memo").  Those recommendations were never made public.

In addition to investigating the destroyed tapes, Durham also conducted a separate investigation into whether anyone had violated federal law in connection with CIA interrogations "overseas."  (Declaration of Douglas Hibbard, Ex. F ("June 2011 AG Statement."))  Durham began that investigation in April 2009 at the direction of Attorney General Eric Holder.  (*Id.*) The investigation led to two "interim reports," two "supplemental reports," and a "final recommendation report."  (Def.'s Mot. Summ. J. ("DOJ Memo"), at 4.)  The Final Recommendation Report (dated May 26, 2011) "discussed the strengths and weaknesses of the facts and evidence uncovered in the course of the preliminary reviews, the potential applicability of various criminal statutes against that evidence, and ultimately why no full criminal investigations should be pursued with the exception of [two matters]."  (Declaration of John Durham ("Durham Decl.") ¶ 14.)  The Supplemental Reports (dated December 14, 2010, and May 26, 2011) "provided additional detail to support [Durham's] recommendation that full criminal investigations be opened to further examine the circumstances surrounding the deaths of two individuals who were in United States custody overseas at the time they died."  (Durham Decl. ¶ 15.)

On June 30, 2011, Attorney General Holder issued a statement announcing a full criminal investigation into the two deaths, as recommended by Durham:

> On Aug. 24, 2009, based on information the Department received pertaining to alleged CIA mistreatment of detainees, I announced that I had expanded Mr. Durham's mandate to conduct a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations. I made clear at that time that the Department would not prosecute anyone who acted in good faith and within the scope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees. Accordingly, Mr. Durham's review examined primarily whether any unauthorized interrogation techniques were used by CIA interrogators, and if so, whether such techniques could constitute violations of the torture statute or any other applicable statute.
>
> In carrying out his mandate, Mr. Durham examined any possible CIA involvement with the interrogation of 101 detainees who were in United States custody subsequent to the terrorist attacks of September 11, 2001, a number of whom were determined by Mr. Durham to have never been in CIA custody. He identified the matters to include within his review by examining various sources including the Office of Professional Responsibility's report regarding the Office of Legal Counsel memoranda related to enhanced interrogation techniques, the 2004 CIA Inspector General's report on enhanced interrogations, additional matters investigated by the CIA Office of Inspector General, the February 2007 International Committee of the Red Cross Report on the Treatment of Fourteen 'High Value Detainees' in CIA Custody, and public source information.
>
> Mr. Durham and his team reviewed a tremendous volume of information pertaining to the detainees. That review included both information and matters that had never previously been examined by the Department. Mr. Durham has advised me of the results of his investigation, and I have accepted his recommendation to conduct a full criminal investigation regarding the death in custody of two individuals . . . .

(June 2011 AG Statement.) The statement concluded: "[T]he Department needed to thoroughly examine the detainee treatment issue. I am confident that Mr. Durham's thorough review has satisfied that need." (*Id.*)

DOJ then opened an investigation into the deaths, again led by Durham's team. (DOJ Memo, at 4.) Each time the team interviewed someone, an FBI agent prepared an FD-302 form. An FD-302 is a standardized document for memorializing a witness interview. Durham edited the forms for the interviews that he attended. In 2012, Durham sent two memoranda to the

Attorney General recommending that no charges be brought in connection with the deaths in

CIA custody (the "Declination Memoranda").

On August 30, 2012, DOJ issued a press release announcing that it would not be filing

criminal charges in connection with the two deaths.  (Declaration of Douglas Hibbard, Ex. G

("August 2012 AG Statement."))  This press release included a three-paragraph section entitled

"Background on Investigation" and a five-paragraph statement by Attorney General Holder.  The

Background section included the following:

> On Aug. 24, 2009, based on information the Department received pertaining to alleged CIA mistreatment of detainees, Attorney General Holder announced that he had expanded Mr. Durham's mandate to conduct a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations.  Attorney General Holder made clear at that time, that the Department would not prosecute anyone who acted in good faith and within the scope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees . . . .

> In June of last year, the Attorney General announced that Mr. Durham recommended opening full criminal investigations regarding the death of two individuals while in United States custody at overseas locations, and closing the remaining matters.  The Attorney General accepted that recommendation.  Today, the Attorney General announced that those two investigations conducted over the past year have now been closed.

(*Id.*)  Attorney General Holder's statement included the following:

> AUSA John Durham has now completed his investigations, and the Department has decided not to initiate criminal charges in these matters.  In reaching this determination, Mr. Durham considered all potentially applicable substantive criminal statutes as well as the statutes of limitations and jurisdictional provisions that govern prosecutions under those statutes.  Mr. Durham and his team reviewed a tremendous volume of information pertaining to the detainees.  That review included both information and matters that were not examined during the Department's prior reviews.  Based on the fully developed factual record concerning the two deaths, the Department has declined prosecution because the admissible evidence would not be sufficient to obtain and sustain a conviction beyond a reasonable doubt.

> During the course of his preliminary review and subsequent investigations, Mr. Durham examined any possible CIA involvement with the interrogation and detention of 101 detainees who were alleged to have been in United States custody subsequent to the terrorist attacks of September 11, 2001.  He determined that a number of the detainees were never in U.S. custody.  Mr. Durham identified the matters to include within his

review by examining various sources including the Office of Professional Responsibility's report regarding the Office of Legal Counsel memoranda related to enhanced interrogation techniques, the 2004 CIA Inspector General's report on enhanced interrogations, additional matters investigated by the CIA Office of Inspector General, the February 2007 International Committee of the Red Cross Report on the Treatment of Fourteen 'High Value Detainees' in CIA Custody, and public source information.

Mr. Durham and his team of agents and prosecutors have worked tirelessly to conduct extraordinarily thorough and complete preliminary reviews and investigations. I am grateful to his team and to him for their commitment to ensuring that the preliminary review and the subsequent investigations fully examines a broad universe of allegations from multiple sources. I continue to believe that our Nation will be better for it.

(*Id.*) The Attorney General concluded: "I asked Mr. Durham to conduct this review based on . . . information and matters presented to me that I believed warranted a thorough examination of the detainee treatment issue. I am confident that Mr. Durham's thorough reviews and determination that the filing of criminal charges would not be appropriate have satisfied that need." (*Id.*)

The present lawsuit arises from FOIA requests related to Durham's investigations. On April 11, 2013, the Times submitted two FOIA requests to DOJ. The first asked for "any reports to the attorney general or deputy attorney general describing or presenting findings" from the Durham investigations. (Declaration of David E. McCraw, Ex. N.) The second asked for "all FBI FD-302 reports summarizing interviews conducted as part of [Durham's investigations]." (*Id.* at Ex. P.) To date, DOJ has neither acted on nor denied these requests. The Times filed this suit on March 28, 2014.

**II.    Discussion**

The parties dispute both the proper legal standard governing Exemption Five cases and the application of that standard to the documents at issue here. But they do not dispute the facts. The Court will first determine the proper legal standard regarding the disputed issues and will then apply that standard to the five sets of documents in this case.

5

### A.      Legal Standards

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Both parties move for summary judgment and neither party disputes the facts, so the question is which party prevails as a matter of law with respect to each set of documents.

"Upon request, FOIA mandates disclosure of records held by a federal agency . . . unless the documents fall within enumerated exemptions." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). The exemptions, then, are given a "narrow compass." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989). DOJ argues that the responsive documents are exempt from disclosure under Exemption Five, which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption incorporates "all the normal civil discovery privileges," *Hopkins v. U.S. Dep't of Hous. And Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991), with the addition of the deliberative process privilege, which is unique to the government, *see* STEPHEN G. BREYER, ET AL., ADMINISTRATIVE LAW AND REGULATORY POLICY 685 (6th ed. 2006).

DOJ contends that all the documents sought here are attorney work product and that the memoranda are protected by the deliberative process exception. The Times argues (1) that the FD-302 reports are not work product and (2) that, although some of the responsive documents are work product, they have been expressly adopted by DOJ and are, therefore, subject to disclosure under FOIA. Because the parties do not dispute the scope of the deliberative process privilege, the Court briefly outlines that privilege first.

6

1.      **Deliberative Process**

The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Klamath Water*, 532 U.S. at 8–9 (2001). The privilege protects documents that are "both predecisional and deliberative." *Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (internal quotation marks omitted). To be "predecisional," unsurprisingly, a document must "precede[] . . . the 'decision' to which it relates." *Id.* To be "deliberative," it must be "actually . . . related to the process by which policies are formulated." *Id*. Legal advice is covered no less than any other kind of advice. *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980). The parties agree that the memoranda are covered by the deliberative process privilege and that the FD-302s are not.

2.      **Work Product**

a.      **The Doctrine**

The work product doctrine protects from discovery materials made by a lawyer or her agent in anticipation of litigation. *See generally* CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE §§ 2022–2024 (3d ed. 2014). Although discovery softens the traditional adversary process, it was "hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring). Thus, the core work product doctrine protects "mental impressions, conclusions, opinions, or legal theories of an attorney" made in anticipation of litigation. Fed. R. Civ. P. 26(b)(3).

Second Circuit law recognizes two kinds of work product: fact and opinion. *In re Grand Jury Subpoena Dated July 5, 2005*, 510 F. 3d 180, 183 (2d Cir. 2007). Opinion work product—

which, as its name suggests, constitutes counsel's opinions regarding the litigation—is entitled to greater protection than factual work product. *Id.*

Facts gathered by a party are to be evaluated on a "case by case" basis in the work-product inquiry, with an eye to the "policy considerations" underlying the privilege. *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 160–61 (2d Cir. 2002). Those policy considerations include protecting the ability of attorneys thoroughly to investigate and analyze their cases without "scrimp[ing] on candor and completeness." *United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998). The basic goal of the doctrine is to promote access to legal services by allowing attorneys to function as advocates with a measure of privacy.

### b.    Substantially Verbatim Witness Statements

As an initial matter, the Times argues that the FD-302 reports are "substantially verbatim recital[s] of [] oral statement[s]" by witnesses and that, therefore, those documents are not work product. (Pl.'s Opp. to Summ. J. ("Times Memo"), at 4.) DOJ argues that verbatim witness accounts can be work product and that, at least where they are prepared by counsel in anticipation of litigation, they are always work product. The first legal dispute between the parties, then, is whether substantially verbatim witness statements are (1) never work product, (2) always work product, or (3) sometimes work product and sometimes not.

The Times first argues, quoting *McDaniel v. Freightliner Corp.*, No. 99-CV-4292 (RMB) (FM), 2000 WL 303293, at *7 (S.D.N.Y. 2000) (Maas, M.J.), that "parties to a civil suit in federal court may . . . obtain from their adversaries as of right any statement which would constitute Jencks Act material in a criminal case." *Id.* The Jencks Act requires disclosure of "substantially verbatim" transcriptions of witness statements to criminal defendants. *Id.* Therefore, the Times argues, DOJ must turn over any substantially verbatim statements in its possession. But the Times has taken the *McDaniel* quote out of context. The civil rules allow a

8

party (or non-party) to discover *his own* substantially verbatim statements.  *McDaniel*, 2000 WL

303293, *8 ("A corporate party is also entitled to discover its prior statements.").  *McDaniel* is

inapposite.

Nonetheless, the Times offers some support for its contention that pure witness

statements cannot be work product.  (Times Memo, at 5 (citing *Young v. California*, No. 05-CV-

2375 (JLS)(CAB), 2007 WL 2900539, at *1 (S.D. Cal. Oct. 1, 2007); *Saunders v. United States*,

316 F.2d 346, 350 (D.C. Cir. 1963) (Reed, J.)).  In *Young*, the court held that the responses to

questionnaires sent by counsel to potential witnesses could not be work product because "[t]he

documents at issue are the verbatim statements of witnesses.  They are the factual observations

of percipient witnesses, not the thoughts or impressions of counsel."  *Young*, 2007 WL 2900539,

at *1.  In *Saunders*, the court held that, under the Jencks Act—which exempts work product from

its disclosure requirements—"it is possible to produce 'statements' taken down by an attorney,

and still preserve the sanctity of the attorney's work product."  *Saunders*, 316 F.2d at 349–50.

The court went on to explain:

> If a government attorney has recorded only his own thoughts in his interview
> notes, the notes would seem both to come within the work product immunity and
> to fall without the statutory definition of a 'statement.'  But if the attorney has
> made only a substantially verbatim record of his interview, then, quite the
> contrary, his notes constitute a 'statement' and include no protected material
> flowing from the attorney's mental processes.

*Id.* at 350.

DOJ contends instead that *Upjohn Co. v. United States*, 449 U.S. 383, 400 (1981), holds

that witness interviews "are entitled to work product protection."  (DOJ Memo, at 9.)  But

*Upjohn* held only that witness interviews are entitled to work product protection "because [they]

tend[] to reveal the attorney's mental processes."  *Id.* at 399.  Similarly, relying on *Director,*

*Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304 (D.C. Cir. 1997), DOJ

argues that interview notes that "merely record verbatim the contents of an interview" are work product.  (DOJ Memo, at 9.)  But that case held only that the notes are protected if they reveal the attorney's mental impressions.  In *Vinson & Elkins*,

> Appellees argue[d], and the district court agreed, that a lawyer's interview notes are *always* opinion work product, undiscoverable without 'extraordinary justification.'  But this proposition goes too far.  We recently observed that under certain circumstances purely factual material embedded in attorney notes may not deserve the super-protection afforded to a lawyer's mental impressions.

*Vinson & Elkins*, 124 F.3d at 1307–08.

Still, DOJ contends that wherever the label "work product" is used in civil discovery, the material is protected from FOIA disclosure.  Thus, *Vinson & Elkins*, according to DOJ, supports its case because there the court held that even interview notes constitute "fact work product," which is entitled to a lesser degree of protection, but is protected nonetheless.  *Id.* at 1307.  But *Vinson & Elkins* arose in a context in which "[t]he parties [did] not dispute that the interview notes are attorney work product."  *Id.*  Here, in contrast, the parties very much dispute that question.  The D.C. Circuit in *Vinson & Elkins* held that what makes interview notes protected— and the axis on which the strength of that protection is to be measured—is their capacity to reveal an attorney's mental processes.

The proper rule, then, is that witness statements are sometimes but not always work product.  They are work product when they reveal an attorney's strategic impressions and mental processes.  This revelation could occur through the attorney's mere selection of whom to interview, even where the content of the interview may not be work product itself.  *Cf. Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir. 1985) (holding that third-party documents can be work product where "identification of . . . documents as a group will reveal defense counsel's selection process, and thus his mental impressions").  Accordingly, the question addressed below is whether any of the FD-302s can be disclosed without revealing Durham's mental processes.

10

### 3.   Express Adoption

A document that would ordinarily be protected under Exemption Five loses its protection

if "the agency has chosen 'expressly to adopt [it] or incorporate [it] by reference.'"  *Nat'l*

*Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355 (2d Cir. 2005) (quoting *NLRB v.*

*Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975)).  The express adoption doctrine stems from the

simple principle that "adopt[ing] a legal position while shielding from public view the analysis

that yielded that position is offensive to FOIA."  *Id.* at 360 (quoting *Nat'l Council of La Raza v.*

*Dep't of Justice*, 339 F. Supp. 2d 572, 587 (S.D.N.Y. 2004)).  The parties dispute whether the

express adoption doctrine applies to the work-product doctrine.  They also dispute the precise

requirements for "adoption" of a document in this context.

### a.   Application of Express Adoption Doctrine to Work Product

The Second Circuit has not "reach[ed] the question of whether th[e] [express adoption]

doctrine would require the disclosure of otherwise exempt attorney work-product."[1]  *Wood v.*

*F.B.I. et al.*, 432 F.3d 78, 84 (2d Cir. 2005) (Sotomayor, J.); *see also Brennan Ctr. for Justice at*

*New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 192 n.10 (2d Cir. 2012).  But

the Second Circuit has held that the doctrine trumps both the deliberative process privilege and

the attorney-client privilege.  *See La Raza*, 411 F.3d at 355, 360; *Brennan Center*, 697 F.3d at

207.  DOJ argues that the logic of the express adoption doctrine breaks down when it is applied

---

[1] In *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967, 974 (7th Cir. 1977), the Seventh Circuit appears to have applied the express adoption doctrine to the work product doctrine, although, in that case, the court treated work product as a subset of the attorney-client privilege.  *Id.*  ("With regard to the attorney-client privilege, [the express adoption] doctrine applies where litigation is contemplated and the document represents attorney work product. Where litigation is foreclosed as an option and the agency expressly chooses to make use of legal memoranda in its final decision, this choice eliminates any claim of attorney work product privilege for the expressly adopted document.") (footnotes omitted).

to the work-product doctrine.  The Times argues, instead, that *La Raza* and *Brennan Center* "compel[] that the doctrine be extended to work product as well."  (Times Memo, at 8.)

DOJ initially focuses on distinguishing the deliberative process privilege from the work-product doctrine.  The express adoption doctrine is premised, DOJ urges, on the observation that an adopted document is no longer "predecisional" and, therefore, no longer protected.  *See Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 n.23 (1979) (citing *Sears*, 421 U.S. at 160). Because a document can be a "decision" and still be protected under the work-product doctrine, some courts have held that that the logic of express adoption does not extend to work-product. *See Iglesias v. CIA*, 525 F. Supp. 547, 559 (D.D.C. 1981); *Exxon Corp. v. FTC*, 476 F. Supp. 713, 726 (D.D.C. 1979) (Oberdorfer, J.).

But the Second Circuit has extended the express adoption doctrine to the attorney-client privilege.  And this brings the doctrine much closer to work product.  DOJ's principal grounds for distinguishing work product from the attorney-client privilege in this context are (1) that waiver and adoption are distinct concepts and (2) that opinion work product is "almost never subject to waiver."[2]  (Def.'s Reply in Support of Summ. J., at 8.)  DOJ's first argument is correct but inapposite.  Although it is true that the exact metes and bounds of waiver doctrine and express adoption doctrine need not be identical, the two concepts are related, as the Second Circuit made clear in *Brennan Center*.  *See* 697 F.3d at 207 (analogizing the express adoption question to the "waiver" of attorney-client privilege).  DOJ's second argument is also correct to a point, but also inapposite.  Indeed, although opinion work product is difficult to waive, work-

---

[2] Neither the Times nor DOJ appears to distinguish between waiver and forfeiture in this context. The Court understands the parties to be discussing waiver as the term is traditionally—and properly—used.  "A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve."  *Foster v. Lee*, No. 13-CV-5857 (JPO), 2015 WL 786990, at *4 n.3 (S.D.N.Y. Feb. 25, 2015) (Oetken, J.) (quoting *Wood v. Milyard*, 132 S.Ct. 1826, 1833 n.4 (2012)).

product protection clearly *can* be waived—even opinion work product.  *E.g.*, *John Doe Corp. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003).

The attorney-client privilege and the work-product doctrine are, if not twins, at least very close siblings.  Both privileges exist to protect the public's ability to access legal services.  The former does so by allowing a client to communicate frankly and openly with his or her counsel; the latter by permitting the "lawyer [to] work with a certain degree of privacy."  *Hickman*, 329 U.S. at 510.  The Second Circuit has held that "the principal rationale behind the attorney-client privilege—to promote open communication between attorneys and their clients so that fully informed legal advice may be given— . . . evaporates . . . once an agency adopts or incorporates [a] document."  *La Raza*, 411 F.3d at 360.  If publicly adopting a document vitiates the purposes of the attorney-client privilege, it is hard to see why it ought not to do the same to the work product doctrine.  Similarly, if justifying agency action on the basis of a document shielded by the attorney-client privilege is offensive to FOIA, it is hard to see why justifying the same action on the basis of a document shielded by the work-product doctrine is not offensive.  The Court concludes, accordingly, that express adoption doctrine applies to the work-product doctrine.

### b.      The Standard for Express Adoption

The next question is what an agency needs to do in order to be found to have expressly adopted a document.  Essentially, the agency must "adopt" the document in an "express" manner.  The question, then, is what precisely constitutes "express" and what is necessary for "adoption."

First, whatever "express" means in this context, it does not mean "express" as that term is ordinarily used.  *Compare* BLACK'S LAW DICTIONARY 661 (9th ed. 2009) ("Clearly and unmistakably communicated; directly stated."), *with La Raza*, 411 F.3d at 358 n.5 ("While the Department urges us to adopt a bright-line test—whereby a document may be deemed expressly

13

adopted or incorporated only in the event that an agency, in essence, uses specific, explicit language of adoption or incorporation—such a test is inappropriate because courts must examine all the relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred."), *and Bronx Def. v. U.S. Dep't of Homeland Sec.*, No. 04-CV-8576 (HB), 2005 WL 3462725, at *6 (S.D.N.Y. Dec. 19, 2005) (rejecting a requirement that "some sort of magic language where the decision-making agency admits reliance" be used).  The agency need not even have explicitly mentioned any specific document in a public statement, so long as its conduct, considered as a whole, manifests an express adoption of the documents.  *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 116 (2d Cir. 2014), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014), *and reh'g denied*, 762 F.3d 233 (2d Cir. 2014).

Second, to adopt a document, an agency must rely, in a final decision, on both the document's conclusion and its reasoning.  Merely adopting the conclusion of a document is insufficient because "the public is vitally concerned with the reasons which . . . suppl[ied] the basis for an agency policy."  *Sears*, 421 U.S. at 152; *see also Wood*, 432 F.3d at 84.  This coheres with the rationale underlying the express adoption doctrine.  The government may not rely on the legitimacy and authority that a document provides while keeping that document secret.

> Any agency faces a political or public relations calculation in deciding whether or not to reference what might otherwise be a protected document in explaining the course of action it has decided to take.  In many cases, as here, the agency is not required to explain its reasons publicly.  Nonetheless, where it determines there is an advantage to doing so by referencing a protected document as authoritative, it cannot then shield the authority upon which it relies from disclosure.

*Brennan Center*, 697 F.3d at 205.

14

The express adoption doctrine originally concerned pre-decisional documents referenced in formal agency opinions, which were specifically subject to disclosure under FOIA as the "working law" of the agency.  *See Sears*, 421 U.S. at 153; *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 170 (1975) (citing 5 U.S.C. § 552(a)(2)(A).  The Second Circuit, in *Brennan Center*, explicitly recognized that *Sears* and *Grumman* in fact contemplated two distinct routes by which a document can lose its privilege on the basis of agency action in this context.  Documents lose privilege "(1) if the[y] ha[ve] 'operative effect' and [are] therefore akin to 'final opinions'—the equivalent of 'working law' in *Sears*'s language; or (2) if the reports' reasoning and conclusions ha[ve] been adopted by the [Agency] in issuing its own decision—the equivalent of 'express adoption or incorporation by reference' in *Sears*."  *Brennan Center*, 697 F.3d at 198.  In *La Raza*, the Second Circuit concluded that, where a series of public statements by the Attorney General and other high-ranking DOJ officials made clear that DOJ had "adopted [a] Memorandum as part of its policy," that memorandum lost its privileged status.  *La Raza*, 411 F.3d at 359-60.  The level of formality with which DOJ adopted the document does not appear to be relevant.  *Id.*; *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("[A document] can lose [privileged] status if it is adopted, *formally or informally*, as the agency position on an issue or is used by the agency in its dealings with the public.") (emphasis added).

Adoption, then, hinges on the extent to which an agency relies on the document's reasoning to justify its actions.  *See Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 11 (D.C. Cir. 2014) (distinguishing *Brennan Center*, 697 F.3d at 204, and *La Raza*, 411 F.3d at 357, on the ground that in those cases "the agency *itself* publicly invoked the reasoning of the OLC memorandum to *justify* its new position.")  This

consideration is more important than the specificity with which a particular document is

referenced.  The touchstone of the express adoption inquiry is whether the agency uses

the reasoning contained in a document, and the authority provided by the document, to

"justify" its actions to the public.  This principle guides the analysis of whether

references to a document were sufficiently "express" and whether those references

adopted that document's "reasoning" rather than merely its conclusion.

### B.      The FD-302 Reports

The Times requests copies of all the FD-302 reports generated in connection with

Durham's investigations.  DOJ contends that the reports are work product and that they are

therefore protected from disclosure.  The Times responds by arguing that the FD-302s are not

work product.  (The Times does not contend that the FD-302 reports were expressly adopted.)

As discussed above, whether the FD-302 reports are work product depends on whether

they reveal Durham's mental impressions and strategic decisions about the investigation.  The

mere selection of whom to interview reveals a great deal about Durham's strategy.  Similarly, the

questions he or his subordinates ask witnesses almost certainly reveal his thinking about the

substance of the case.  It is impossible for DOJ to disclose the FD-302s without revealing

protected information about Durham's case analysis and strategy.  *See Sporck*, 759 F.2d at 315.

As such, the FD-302s are exempt from disclosure under FOIA Exemption Five.

### C.      Memoranda

The parties agree that the all the memoranda sought in this case are covered by the work

product doctrine and are therefore within Exemption Five of FOIA.  The only question, then, is

whether the express adoption doctrine applies.

16

1.      **Tape Destruction Report**

The public statement announcing the closure of the tape destruction investigation reads,

in full:

> In January 2008, Attorney General Michael Mukasey appointed Assistant United
> States Attorney John Durham to investigate the destruction by CIA personnel of
> videotapes of detainee interrogations.  Since that time, a team of prosecutors and
> FBI agents led by Mr. Durham has conducted an exhaustive investigation into the
> matter.  As a result of that investigation, Mr. Durham has concluded that he will
> not pursue criminal charges for the destruction of the interrogation videotapes.

(Hibbard Decl. Ex. E-1.)

This statement is insufficient to adopt the reasoning of the Tape Destruction Report.

Indeed, DOJ did not publicly justify its decision not to pursue charges at all, let alone justify that

decision with the contents of an undisclosed memorandum.  DOJ's motion for partial summary

judgment that the Tape Destruction Report is protected by Exemption Five is therefore granted.

2.      **The Obstruction Memo**

DOJ has yet to publicly announce the results of the obstruction investigation at all, let

alone explain those results with reasoning from a secret document.  Therefore, DOJ's motion for

partial summary judgment that the Obstruction Memo is covered by Exemption Five is granted.

3.      **The Recommendation Memoranda**

The Attorney General announced the full criminal investigation into deaths in CIA

custody in June 2011.  (June 2011 AG Statement.)  That announcement went beyond earlier

public statements on the Durham investigation.  The June 2011 press release described Durham's

process, identified his sources, and concluded that Durham's "thorough review ha[d] satisfied

th[e] need" for a DOJ investigation of detainee treatment.  (*Id.*)  The press release explicitly

stated that the Attorney General had "accepted [Durham's] recommendation to conduct a full

criminal investigation" with respect to the deaths of two individuals in U.S. custody.  (*Id.*)  It

also adopted Durham's conclusion that "an expanded criminal investigation of the remaining

matters is not warranted." (*Id.*) These statements were reiterated in the August 30, 2012 press

release.

The Court concludes that, taken in context, these statements trigger the express adoption

doctrine. The June 2011 press release presented the Durham investigation as DOJ's authoritative

examination of "the detainee treatment issue." (*Id.*) The release relied on Durham's final

reports—and on his review of federal law—to justify the Attorney General's decisions (1) to

launch a full criminal investigation with respect to two deaths and (2) to decline to further pursue

any other criminal investigation regarding detainee treatment. The Attorney General did not

have to invoke Durham's legal analysis "to justify and explain the Department's policy," *La

Raza*, 411 F.3d at 358, nor did he have to frame Durham's recommendation "as a *basis* for his

decision," *Montrose Chem. Corp v. Train*, 491 F.2d 63, 70 (D.C. Cir. 1974) ("[O]nce adopted as

a rationale for a decision, the memorandum becomes part of the public record."). But when he

did, he adopted Durham's reasoning as his own.

In *Sears*, the Supreme Court wrote that "the public interest in knowing the reasons for a

policy actually adopted by an agency" supports disclosure. *Sears*, 421 U.S. at 161; *see also La

Raza*, 411 F.3d at 357. In *La Raza*, the Second Circuit rejected a "bright-line test" for express

adoption and instead endorsed a contextual approach to Exemption Five analysis. *La Raza*, 411

F.3d at 357 n.5. Under these precedents, Exemption Five does not apply when an agency refers

to a privileged document, and borrows that document's legitimacy, to rationalize its public

decisions.

The Attorney General's June 2011 statement manifested DOJ's adoption of Durham's

Final Recommendation Report and Supplemental Reports. Accordingly, DOJ's motion for

partial summary judgment as to those memoranda is denied and the Times's motion is granted.

18

Because the two Interim Reports contained preliminary conclusions and appear to have been superseded by the Final Recommendation Report, DOJ's motion for summary judgment is granted and the Times's motion is denied as to the Interim Reports.

### 4.    The Declination Memoranda

The Attorney General also relied on Durham's reasoning to justify his decision not to file criminal charges in connection with deaths in custody.  The press release announcing the decision invoked the authority of Durham's recommendation.  (August 2012 AG Statement.) Indeed, the release can be read as presenting the decision not to prosecute as fundamentally a determination made by *Durham*.  The statement reads:

> AUSA John Durham has now completed his investigations, and the Department has decided not to initiate criminal charges in these matters.  In reaching this determination, Mr. Durham considered all potentially applicable substantive criminal statutes as well as the statutes of limitations and jurisdictional provisions that govern prosecution . . . .

(*Id.*)  At the conclusion of the press release, the Attorney General again frames the determination as follows:

> I asked Mr. Durham to conduct his review based on existing information as well as new information and matters presented to me that I believed warranted a thorough examination of the detainee treatment issue.  I am confident that Mr. Durham's thorough reviews and determination that the filing of criminal charges would not be appropriate have satisfied that need.

(*Id.*)

The press release also cast Durham's "extraordinarily thorough and complete" investigation as the basis for the decision not to prosecute.  Specifically, the Attorney General said that, "[b]ased on the fully developed factual record concerning the two deaths, the Department ha[d] declined prosecution because the admissible evidence would not be sufficient to obtain and sustain a conviction beyond a reasonable doubt."  (*Id.*)  To be sure, this is a fairly general reason for declining to prosecute.  However, there are a number of reasons DOJ could

have decided not to prosecute anyone in connection with deaths in CIA custody. And DOJ provided this as the reason for not prosecuting after listing the sources and legal benchmarks for Durham's investigation, describing the scope of his investigation, and ultimately adopting Durham's recommendations.

The Attorney General was not obliged to represent "Durham's . . . determination" as the basis for his decision. Situating the Declination Memoranda in this light rendered it authoritative, conferring legitimacy on the Attorney's General's decision. *Sears*, *La Raza*, and their progeny aim to capture this sort of incorporation by reference. *See Sears*, 421 U.S. at 152; *La Raza*, 411 F.3d at 358, 361 ("[T]he Attorney General . . . made a practice of using the OLC Memorandum to justify and explain the Department's policy . . . . We cannot allow the Department to make public use of the Memorandum when it serves the Department's ends but claim . . . privilege when it does not.").

Because DOJ relied on Durham's reasoning in explaining its decision not to prosecute, the Court concludes that the Declination Memoranda were "expressly adopted" and are therefore subject to disclosure under FOIA. Accordingly, DOJ's motion for partial summary judgment as to those memoranda is denied and the Times's motion is granted.

The Court acknowledges that the application of the express adoption doctrine to Durham's memoranda in this case presents challenging questions. The Second Circuit's decision in *La Raza* was, in its own terms, decided "in light of all the facts and circumstances." *La Raza*, 411 F.3d at 360. And there are distinctions between this case, on the one hand, and *La Raza* and *Brennan Center*, on the other, that are arguably relevant. For example, memoranda of the Office of Legal Counsel are authoritative in a way that the memoranda here are not—because OLC's advice constitutes *binding* authority within the executive branch. *See United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011) ("Office of Legal Counsel opinions are generally viewed

as providing binding interpretive guidance for executive agencies and reflecting the legal position of the executive branch." (internal quotation marks, citations, and alterations omitted)), *aff'd in part, rev'd in part and remanded on other grounds*, 132 S. Ct. 2492 (2012).  But there is no indication in *La Raza* and *Brennan Center* that the express adoption doctrine is limited to the context of OLC opinions, and the Supreme Court's decision in *Sears* indicates that it is not so limited.

The Court has also considered whether the express adoption doctrine should apply to decisions involving criminal prosecution, given the strong tradition of prosecutorial discretion, or to decisions that involve specific facts rather than the sort of "policy" decisions addressed in *La Raza* and *Brennan Center*.  Again, however, the Second Circuit's decisions do not appear to support such a limitation on the doctrine, and such a limitation would seem to be undermined by *Sears* (which involved NLRB charging decisions) and the Seventh Circuit's *Niemeier* decision (which involved the decision not to seek an indictment of President Nixon).  Finally, the Court is mindful of the concern that a robust express adoption doctrine could create incentives for public officials to reveal less about the reasons for decisions, rather than more, arguably in tension with the goals of FOIA.  Nonetheless, for the reasons explained above, the Court concludes that a fair reading of the Second Circuit's case law makes the doctrine applicable here.

Of course, it might be the case that portions of the memoranda do not support—or even explicitly concern—Durham's reasoning regarding the sufficiency of the evidence or the applicable federal law.  Imagine, for example, that one section of the memorandum outlines why Durham believes the evidence to be insufficient while another section outlines why Durham believes prosecution to be inequitable or unwise for other reasons.  DOJ should not be required to disclose those portions of the memorandum that do not support the reasoning on which the Attorney General publicly relied.  Because DOJ has indicated that it will move for summary

judgment on other FOIA exemptions if it does not prevail here, the Court need not, and does not, decide whether the memoranda must be disclosed in their entirety.  The parties are directed to address this issue, if it is applicable, in the next round of briefing.

**III.    Conclusion**

For the foregoing reasons, DOJ's motion for summary judgment is granted in part and denied in part; and the Times's motion for partial summary judgment is granted in part and denied in part.

The parties are directed to confer and to submit a proposed briefing schedule on any further motions on or before October 30, 2015.

The Clerk of Court is directed to close the motions at Docket Numbers 9 and 14.


SO ORDERED.


Dated: September 30, 2015
       New York, New York

                                                J. PAUL OETKEN
                                           United States District Judge